[No. 39487-1-II. Division Two. November 9, 2010.]

ST. JOSEPH GENERAL HOSPITAL, *Appellant*, v. THE DEPARTMENT OF REVENUE, *Respondent*.

452

*Carla M. Dewberry* and *Roger L. Hillman* (of *Garvey Schubert Barer*) and *Jamal N. Whitehead* (of the *Equal Employment Opportunity Commission*), for appellant.

*Robert M. McKenna, Attorney General, David M. Hankins, Senior Counsel,* and *Peter B. Gonick, Assistant,* for respondent.

¶1 Bridgewater, J. — St. Joseph General Hospital (St. Joseph or hospital) appeals from a Board of Tax Appeals (Board) order requiring it to pay business and occupation (B&O) tax pursuant to RCW 82.04.220 for amounts (1) received from Medicare beneficiaries[1] and their secondary insurers (Medigap insurers) for patient copayments and deductibles and (2) the hospital paid to an emergency room physician organization. The hospital argues that, under the plain language of former RCW 82.04.4297 (1988), Medicare beneficiaries and Medigap insurers act as instrumentalities of the United States when they pay patient copayments and deductibles. Thus, the hospital argues, it may deduct those amounts from its gross revenue for purposes of the B&O tax. In addition, the hospital contends that the amounts it paid to the emergency room physicians do not meet the statutory definition of "gross income" and are therefore not subject to the B&O tax. We affirm the Board as to the hospital's obligation to pay B&O taxes on Medicare beneficiaries' copayments and deductibles but we reverse, vacate, and remand the Board's ruling regarding the amounts paid to emergency room physicians.

---

[1] A "medicare beneficiary" means an individual who is entitled to benefits under Medicare's part A or part B. 42 U.S.C. § 1395a(b)(5)(A).

## FACTS

¶2 St. Joseph contracts with Medicare to provide services to Medicare beneficiaries. Although Medicare pays St. Joseph for part of the costs its beneficiaries incur, Medicare beneficiaries still pay a deductible and/or copayment. Medicare beneficiaries may also purchase supplemental insurance, called Medigap insurance, to help cover the costs of their copayments and deductibles. If Medicare beneficiaries or Medigap insurers fail to pay St. Joseph the copayments and deductibles owed, Medicare, at its discretion, will reimburse the hospital for a portion of the amount owed. These unpaid amounts are called "bad debt[s]," and the hospital must undertake certain collection actions before Medicare will pay. Board of Tax Appeals Record (BTAR) at 357. Medicare pays a varying percentage of the hospital's bad debts based on budgetary factors.

¶3 St. Joseph is not licensed to provide physician services, so it contracts with physicians to perform these services. During the relevant period, St. Joseph had a contract with Northwest Emergency Physicians (NEP), in which NEP agreed to provide emergency room physician services to St. Joseph's patients. The hospital granted NEP the exclusive right to provide emergency services at the hospital. In exchange, the hospital provided space, utilities, supplies, transcription, medical records, and equipment for NEP's physicians. The hospital was also responsible for hiring all nonphysician personnel supporting the contract physicians. St. Joseph treats NEP as an independent contractor, and each physician is an NEP employee or agent.

¶4 NEP "appoint[ed St. Joseph] as its agent for the limited purpose of acting as a billing and collecting agent for the professional charges to patients for services by [NEP] physicians and physician extenders." BTAR at 410. NEP agreed to charge patients on a fee-for-service basis, and St. Joseph agreed to bill the patients those amounts. St. Joseph agreed to send patients one bill that separately identified the professional component of the services.

¶5 In 1998, the hospital agreed to pay NEP 66.7 percent of the gross professional charges for the prior month. The hospital retained 33.3 percent as payment for the hospital's administrative duties, billing, contractual disallowances, bad debt, and other contractual duties. St. Joseph conceded that the amount it retained is subject to the B&O tax. The hospital paid NEP 66.7 percent of the gross amount of the prior month's billings regardless of how much it collected, even if this resulted in an over- or underpayment. The hospital recalculated the percentage it paid NEP at the beginning of each new contract based on the amount the hospital had actually recovered during the most recent time period.

¶6 The Department of Revenue (Department) audited St. Joseph's finances for the 1997-2000 tax period and assessed B&O tax on money the hospital received as income from Medicare beneficiaries and Medigap insurers for their Medicare copayments and deductibles, as well as for the money received from emergency room services, without deducting the amounts paid to NEP. St. Joseph unsuccessfully appealed to the Department's appeals division. St. Joseph then appealed to the Board, which granted the Department's motion for summary judgment. As to the Medicare payments, the Board found:

> Although patients have legal rights in accordance with the statutory provisions of Medicare, it is not a "contractual" relationship where the patients are agreeing to pay the deductibles and co-payments for Medicare. The patients are making the payments for themselves. The patients' insurers are making payment on behalf of the patient (patients voluntarily pay for supplemental insurance policies with their funds), not Medicare. The statutory scheme requiring a Medicare patient to pay a deductible or co-payment makes the patients' payment their individual responsibility, not Medicare's responsibility.

BTAR at 26. Finding that the hospital did not meet the pass-through B&O exception of WAC 458-20-111 (Rule 111), the Board also upheld the Department's assessment

on the entire amount the hospital received for emergency room services provided by NEP. St. Joseph appealed to the superior court, which also affirmed.[2]

## ANALYSIS

### I. B&O DEDUCTION—INSTRUMENTALITIES OF THE UNITED STATES

¶7 St. Joseph argues that it may deduct from its gross income subject to the B&O tax Medicare copayments and deductibles received from Medicare beneficiaries and their Medigap insurers because the hospital receives these amounts from instrumentalities of the United States. We disagree.

### A. Standard of Review

¶8 We review the Board's decision, not the trial court's. *Conway v. Dep't of Soc. & Health Servs.*, 131 Wn. App. 406, 414, 120 P.3d 130 (2005). On review of an agency order under the Administrative Procedure Act, chapter 34.05 RCW, we reverse an agency decision when based on an erroneous interpretation or application of the law. RCW 34.05.570(3)(d). We review de novo decisions based on interpretation of the law. *Advanced Silicon Materials, LLC v. Grant County*, 156 Wn.2d 84, 89, 124 P.3d 294 (2005). We accord substantial weight to the agency's interpretation of the law, although we may substitute our judgment for the agency's. *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 728, 818 P.2d 1062 (1991). As the challenging party, the hospital bears the burden of demonstrating an invalid agency action. RCW 34.05.570(1)(a); *DaVita, Inc. v. Dep't of Health*, 137 Wn. App. 174, 180, 151 P.3d 1095 (2007).

---

[2] Initially, St. Joseph does not assign error to any action taken by the Board. Instead, St. Joseph assigned error to the superior court's order affirming the Board's final decision. St. Joseph also did not designate the Board's decision in its notice of appeal. St. Joseph designated the superior court's order instead. We review the Board's decision. *Conway v. Dep't of Soc. & Health Servs.*, 131 Wn. App. 406, 414, 120 P.3d 130 (2005). In post-oral-argument briefing, the parties agree that the record before us allows adequate review.

¶9 When reviewing an order granting summary judgment, we engage in the same inquiry as the trial court. *Kahn v. Salerno*, 90 Wn. App. 110, 117, 951 P.2d 321, *review denied*, 136 Wn.2d 1016 (1998). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends, in whole or in part. *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974). We consider all reasonable inferences in the light most favorable to the nonmoving party. *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993).

B. Plain Language

¶10 The State imposes a B&O tax on every person for the act or privilege of engaging in business activities, which tax is based on the gross income of the business. RCW 82.04.220. The legislature intended to impose the B&O tax on virtually all business activities carried out within the state. *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149, 3 P.3d 741 (2000). Unless an exemption or deduction applies, a taxpayer owes B&O tax on all income received for services rendered, including services related to health care. *Wash. Imaging Servs., LLC v. Dep't of Revenue*, 153 Wn. App. 281, 294, 222 P.3d 801 (2009), *review granted*, 168 Wn.2d 1031 (2010). We construe tax deduction statutes narrowly. *United Parcel Serv., Inc. v. Dep't of Revenue*, 102 Wn.2d 355, 360, 687 P.2d 186 (1984). Any ambiguity is strictly, but fairly, construed against the taxpayer. *Grp. Health Coop. of Puget Sound, Inc. v. Wash. State Tax Comm'n*, 72 Wn.2d 422, 429, 433 P.2d 201 (1967). The taxpayer bears the burden of proving that it qualifies for a tax deduction. *Grp. Health*, 72 Wn.2d at 429.

¶11 Washington's B&O tax applies to health care services. *See* RCW 82.04.322; former RCW 82.04.4297;

RCW 82.04.431 (allowing for B&O exemptions and deductions for various aspects of health services). But

> [i]n computing tax there may be deducted from the measure of tax amounts received from the United States or any instrumentality thereof or from the state of Washington or any municipal corporation or political subdivision thereof as compensation for, or to support, health or social welfare services rendered by a health or social welfare organization or by a municipal corporation or political subdivision.

Former RCW 82.04.4297.[3]

¶12 St. Joseph argues that the plain language meaning of the term "instrumentality" as used in former RCW 82.04.4297 includes deductibles and copayments from Medicare beneficiaries and Medigap insurers. We disagree.

¶13 We review questions of law, including statutory construction, de novo. *City of Pasco v. Pub. Emp't Relations Comm'n*, 119 Wn.2d 504, 507, 833 P.2d 381 (1992). When called upon to interpret a statute, our fundamental obligation is to give effect to the legislature's intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). When interpreting a statute we first look to its plain language. *Campbell & Gwinn, LLC*, 146 Wn.2d at 9. If the plain language is subject to only one interpretation, the inquiry ends because plain language does not require construction. *Campbell & Gwinn, LLC*, 146 Wn.2d at 9-10.

¶14 A statute's plain meaning may be discerned "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Campbell & Gwinn, LLC*, 146 Wn.2d at 11. Absent ambiguity or a statutory definition, we give the

---

[3] In 2001, the legislature amended former RCW 82.04.4297 to clarify that "amounts received from" included amounts received from a nonprofit hospital, a public hospital that is a managed care organization, or any other entity that is under contract to manage health care benefits for Medicare or other government health care plans. LAWS OF 2001, 2d Spec. Sess., ch. 23, § 2. In 2002, the legislature deleted the 2001 amended language and created a new subsection stating, "The deduction authorized by this section does not apply to amounts received from patient copayments or patient deductibles." LAWS OF 2002, ch. 314, §§ 2, 3 (§ 2 codified as RCW 82.04.4311(1)).

words in a statute their common and ordinary meaning. *Garrison v. Wash. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976). To determine the plain meaning of an undefined term, we may look to the dictionary. *Garrison*, 87 Wn.2d at 196. Here, the parties agree that, based on the dictionary definition of "instrumentality," the plain language of former RCW 82.04.4297 controls.

¶15 "Instrumentality" is the

quality or state of being instrumental : a condition of serving as an intermediary . . . something by which an end is achieved . . . something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out : a part, organ, or subsidiary branch esp. of a governing body.

Webster's Third New International Dictionary 1172 (3d ed. 2002). "Instrumentality" is also defined as "**1.** A thing used to achieve an end or purpose. **2.** A means or agency through which a function of another entity is accomplished, such as a branch of a governing body." Black's Law Dictionary 870 (9th ed. 2009).

¶16 St. Joseph contends that "an instrumentality is a person or an entity used to accomplish the ends of another." Br. of Appellant at 11. St. Joseph asserts that Medicare's "end" is compensating it for costs it incurs while caring for Medicare beneficiaries. Br. of Appellant at 11. St. Joseph asserts that Medicare uses payment from Medicare beneficiaries and Medigap insurers as the means to accomplish this end. But to persuade us that the Medicare beneficiaries and Medigap insurers are instrumentalities of the United States, St. Joseph must show that (1) Medicare beneficiaries and Medigap insurers accomplished a Medicare function when they paid copayments and deductibles and (2) by doing so, they acted as a part, organ, or subsidiary branch of Medicare.

¶17 Medicare's function is not to compensate St. Joseph, but to provide basic protection against the costs of hospital, related posthospital, home health services, and hospice

care. 42 U.S.C. § 1395c. Payments Medicare makes directly to the hospital accomplishes this goal by reducing costs to Medicare beneficiaries for the enumerated services. Copayments and deductibles do not help provide protection against health care costs because they are health care costs. Medicare beneficiaries and Medigap insurers, therefore, do not perform a Medicare function when they pay copayments and deductibles.

¶18 Furthermore, Medicare beneficiaries and Medigap insurers do not act on behalf of Medicare when they pay deductibles and copayments. The hospital receives Medicare copayments or deductibles from either Medicare beneficiaries or their Medigap insurers. Medicare deductibles and copayments are the responsibility of the patient or the patient's Medigap insurer. The hospital acknowledged that any money received from Medigap insurers did not come from the Medicare program but from private insurance companies that acted on behalf of Medicare beneficiaries. The hospital also admitted that, besides bad debt amounts, Medicare did not pay any of the amounts patients owed.[4]

¶19 Medicare's manual also supports the conclusion that Medicare beneficiaries and their Medigap insurers made copayment and deductible payments on behalf of the beneficiaries, not Medicare. The manual states that the patient must authorize payment of Medicare benefits on his or her behalf. The manual also permits the hospital to bill the *patient* for Medicare copayments and deductibles. Further, amounts incorrectly collected from beneficiaries or persons acting on their behalf must be promptly refunded by the hospital to the payors, not to Medicare.

¶20 The fact that Medigap insurers are regulated by the government does not make the insurers instrumentalities of the United States, as the hospital contends. Many types of insurance are regulated, yet remain independent businesses. In addition, Medigap insurers act on behalf of their

---

[4] Because the hospital is entitled to deduct the bad debt amounts from its B&O tax, the parties do not dispute that bad debt payments received from Medicare fall within the exemption of former RCW 82.04.4297.

insureds, not Medicare, when paying copayments and deductibles. Nor does the fact that Medicare chooses to pay a portion of a hospital's bad debts make Medicare beneficiaries and their Medigap insurers an arm or organ of the government. Medicare beneficiaries and their Medigap insurers have no part in the bad debt payments and they do not direct that the payments be made. Further, the hospital is already entitled to deduct the bad debt amounts from its B&O tax. That Medicare pays some portion of the hospital's bad debts does not make Medicare beneficiaries and their Medigap insurers instrumentalities of the United States.

¶21 Medicare beneficiaries and their Medigap insurers were thus acting on behalf of the beneficiary, not Medicare. The hospital failed to show that Medicare beneficiaries and their Medigap insurers acted as a part, organ, or subsidiary branch of Medicare. We hold that under the plain language of former RCW 82.04.4297, amounts received by St. Joseph from Medicare beneficiaries and their Medigap insurers for copayments and deductibles are not amounts received from an instrumentality of the United States. Thus, the language is neither ambiguous nor subject to further interpretation. The Department was entitled to judgment as a matter of law and the Board did not err as a matter of law in imposing the B&O tax on St. Joseph for amounts paid by Medicare beneficiaries and their Medigap insurers for copayments and deductibles. CR 56(c); RCW 34.05.570(3)(d).

II. PAYMENTS TO NEP

¶22 The State imposes a B&O tax on every person for the act or privilege of engaging in business activities, which tax is measured by the business's gross income. RCW 82.04-.220. St. Joseph argues that money it collected and paid to NEP for professional medical emergency room services rendered by NEP is not gross income under former RCW 82.04.080 (1961). We agree.

¶23 "Gross income of the business" means

the *value proceeding or accruing* by reason of the transaction of the business engaged in and includes gross proceeds of sales,

*compensation for the rendition of services*, gains realized from trading in stocks, bonds, or other evidences of indebtedness, interest, discount, rents, royalties, fees, commissions, dividends, and other emoluments however designated, all without any deduction on account of the cost of tangible property sold, the cost of materials used, labor costs, interest, discount, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses.

Former RCW 82.04.080 (emphasis added). "Value proceeding or accruing" means "the consideration, whether money, credits, rights, or other property expressed in terms of money, actually received or accrued." RCW 82.04.090. Compensation or consideration for service is thus the basis for the tax. *Walthew, Warner, Keefe, Arron, Costello & Thompson v. Dep't of Revenue*, 103 Wn.2d 183, 187, 691 P.2d 559 (1984).

¶24 Because B&O tax is based on gross income, rather than net income, a business is taxed on the entire gain it accrues from its transactions, and no deduction is allowed for the expenses involved in conducting the business. Former RCW 82.04.080; *Rho Co. v. Dep't of Revenue*, 113 Wn.2d 561, 566, 782 P.2d 986 (1989). Therefore, as a general rule, the base amount from which the B&O tax is calculated does not allow for deductions for the expenses of conducting business. *Rho*, 113 Wn.2d at 566-67.

¶25 St. Joseph argues that money it collected and paid to NEP for professional medical services rendered by NEP is not gross income under former RCW 82.04.080. It contends that it does not have to show it qualifies for a Rule 111 deduction because the emergency room revenue is not part of St. Joseph's gross income. St. Joseph argues that the funds it collects for physician emergency services belong to NEP and that the funds do not constitute compensation for services rendered by the hospital. The Department contends that, unless St. Joseph satisfies the requirements of Rule 111, the funds at issue are part of the cost of doing business and are included in gross income as a matter of law. We hold that the amounts St. Joseph paid to

NEP (1) do not meet the requirements of Rule 111 but (2) also do not meet the statutory definition of "gross income."

## A. Rule 111

 ¶26 The hospital is not entitled to a Rule 111 exemption. The Department has promulgated a rule that permits businesses to exclude from its gross income certain amounts advanced or reimbursed:

> The word "advance" as used herein, means money or credits received by a taxpayer from a customer or client with which the taxpayer is to pay costs or fees for the customer or client.
>
> The word "reimbursement" as used herein, means money or credits received from a customer or client to repay the taxpayer for money or credits expended by the taxpayer in payment of costs or fees for the client.
>
> The words "advance" and "reimbursement" apply only when the customer or client alone is liable for the payment of the fees or costs and when the taxpayer making the payment has no personal liability therefor, either primarily or secondarily, other than as agent for the customer or client.
>
> There may be excluded from the measure of tax amounts representing money or credit received by a taxpayer as reimbursement of an advance in accordance with the regular and usual custom of his business or profession.
>
> The foregoing is limited to cases wherein the taxpayer, as an incident to the business, undertakes, on behalf of the customer, guest or client, the payment of money, either upon an obligation owing by the customer, guest or client to a third person, or in procuring a service for the customer, guest or client which the taxpayer does not or cannot render and for which no liability attaches to the taxpayer. It does not apply to cases where the customer, guest or client makes advances to the taxpayer upon services to be rendered by the taxpayer or upon goods to be purchased by the taxpayer in carrying on the business in which the taxpayer engages.

WAC 458-20-111. There are three requirements under Rule 111 before a taxpayer may exclude from its gross income

amounts received from a client: (1) it is a customary reimbursement or advancement made to procure a service for the client, (2) the taxpayer does not or cannot render the service, and (3) the taxpayer was not liable for the payment. *Christensen, O'Connor, Garrison & Havelka v. Dep't of Revenue*, 97 Wn.2d 764, 768, 649 P.2d 839 (1982).

¶27 Citing *Medical Consultants Northwest, Inc. v. State*, 89 Wn. App. 39, 947 P.2d 784 (1997), *review denied*, 136 Wn.2d 1002 (1998), St. Joseph argues that the funds it receives from patients and subsequently pays to NEP do not constitute gross income because the funds are not compensation for services rendered by the hospital. But *Medical Consultants* determined whether the taxpayer was entitled to a Rule 111 exemption, not whether the amounts received by the taxpayer met the statutory definition of gross income. *Med. Consultants*, 89 Wn. App. at 47.

¶28 In *Medical Consultants*, the taxpayer, Medical Consultants Northwest (MCN), provided medical opinions in the form of written reports; these written opinions were based on medical examinations performed by independent physicians. *Med. Consultants*, 89 Wn. App. at 41. Because MCN did not have a license to practice medicine, it contracted with individual physicians to conduct independent medical examinations (IMEs) on behalf of MCN's clients. *Med. Consultants*, 89 Wn. App. at 42. MCN then completed a written report based on the physician's notes; after completing the report, MCN billed its clients for services it provided as well as the IMEs conducted by the independent physicians. *Med. Consultants*, 89 Wn. App. at 42. The client paid the total fee for services in one check and, upon receipt of payment, MCN forwarded the allocable portion to the physician for services rendered. *Med. Consultants*, 89 Wn. App. at 42. If MCN was unable to collect a fee from the client, MCN was not obligated to pay the physician for his or her services. *Med. Consultants*, 89 Wn. App. at 43.

¶29 We held that the first prong of the *Christensen* test was not in dispute. *Med. Consultants*, 89 Wn. App. at 48. The second element was supported by the undisputed fact

that MCN did not have a medical license and therefore could not perform the medical examinations. *Med. Consultants,* 89 Wn. App. at 48. Finally, the third prong was satisfied because MCN was not obligated to pay an independent physician unless the patient or patient's insurance company paid MCN. *Med. Consultants,* 89 Wn. App. at 48. Thus, MCN qualified for the Rule 111 exemption. *Med. Consultants,* 89 Wn. App. at 48.

¶30 Here, the amounts paid to emergency physicians via NEP were likely reimbursements or advances made in the ordinary course of the hospital's business. *Christensen,* 97 Wn.2d at 768. The hospital paid NEP before it received payment from the patient or the patient's insurance company. *See Pilcher v. Dep't of Revenue,* 112 Wn. App. 428, 440, 49 P.3d 947 (2002) (payments were not advances or reimbursements because third party was not paid until taxpayer received money from the client), *review denied,* 149 Wn.2d 1004 (2003). The second element is met because, like MCN, the hospital is not licensed to perform the services NEP's physicians perform.

¶31 But, the third element is not satisfied.

¶32 While the hospital's contract stated that it acted as NEP's agent for billing purposes, the hospital had more than agent liability, as the State argues. *Rho Co.,* 113 Wn.2d at 570 (this court looks beyond the contractual labels to determine agency relationship). Unlike MCN, the hospital remained liable to pay its predetermined contract percentage of its gross billing to NEP even if the patient or patient's insurance did not pay for NEP's services.[5] This sometimes resulted in over- or underpayment. The hospital has never reconciled its accounts to pay or receive back any differences between the calculated rate and the amounts actually collected. The hospital therefore had more than mere agent liability for the amounts it paid NEP and, thus, under *Medical Consultants,* St. Joseph is not entitled to a Rule 111 deduction.

---

[5] To the extent that the hospital claims that it passes on to NEP only amounts it collects from patients, it is incorrect.

¶33 St. Joseph's situation is similar to that of Evergreen Staffing in *City of Tacoma v. William Rogers Co.*, 148 Wn.2d 169, 60 P.3d 79 (2002). In that case, the taxpayer remained liable for its employees' wages, regardless of whether the company's client paid it for the employees' work. *William Rogers Co.*, 148 Wn.2d at 173. Our Supreme Court held, "Compensation is one of the most significant factors in determining the relationship between a principal and an agent." *William Rogers Co.*, 148 Wn.2d at 179. Regardless of whether it received reimbursements from its clients, the taxpayer was responsible for paying its workers. *William Rogers Co.*, 148 Wn.2d at 179. The court reasoned that if the taxpayer "had only agency liability, it would not be making payments that were unauthorized by the principal." *William Rogers Co.*, 148 Wn.2d at 180. As such, the taxpayer was not entitled to a Rule 111 exemption. *William Rogers Co.*, 148 Wn.2d at 181.

¶34 Similarly, St. Joseph pays NEP a predetermined percentage of its gross billing. Regardless of whether patients or their insurance companies pay, the hospital is responsible for paying NEP. *William Rogers Co.*, 148 Wn.2d at 179. As in *William Rogers Co.*, St. Joseph does not have only agency liability for the amounts it pays NEP because it pays NEP the agreed contract amounts even when not reimbursed by those receiving the emergency room physician services. *William Rogers Co.*, 148 Wn.2d at 180. The hospital is not entitled to a Rule 111 exemption. *See also Pilcher*, 112 Wn. App. at 441 (taxpayer has more than agent liability when taxpayer is liable to pay regardless of whether the client has paid); *Christensen*, 97 Wn.2d at 770 (no agent liability for amounts paid to third party on behalf of client where firm not liable for payment if client does not pay).

## B. Gross Income

¶35 St Joseph also argues that it need not seek a Rule 111 exemption because the amounts it received and, paid to NEP are not gross income. We agree.

¶36 Again, we review questions of statutory construction de novo, giving effect to the legislature's intent and looking to the statute's plain language. *Campbell & Gwinn, LLC*, 146 Wn.2d at 9-10; *City of Pasco*, 119 Wn.2d at 507. We construe tax deduction statutes narrowly, construing any ambiguity strictly, but fairly, against the taxpayer. *United Parcel Serv.*, 102 Wn.2d at 360; *Grp. Health*, 72 Wn.2d at 429. The taxpayer bears the burden of proving that it qualifies for a tax deduction. *Grp. Health*, 72 Wn.2d at 429.

¶37 Again, "gross income of the business" means "the value proceeding or accruing by reason of the transaction of the business engaged in . . . ." Former RCW 82.04.080. "Value proceeding or accruing" means "the consideration, whether money, credits, rights, or other property expressed in terms of money, actually received or accrued." RCW 82.04.090. Thus, under the plain language of former RCW 82.04.080 and .090, money received is "gross income" if the taxpayer received or accrued the amount by reason of the transaction of the business in which it was engaged.

¶38 Here, the hospital is not in the business of providing emergency room physician services. The hospital lacks a medical license and cannot perform physician services. NEP is the only group permitted to provide emergency services at the hospital. The hospital, by contrast, provides space, utilities, supplies, equipment, transcription, medical charts, and nonphysician personnel. To the extent the hospital receives or accrues compensation for the emergency room physician services, it does so because of NEP's business. The hospital does not retain the collected amounts but paid to NEP according to their contract. Thus, the amounts the hospital receives for emergency room physician services are not the hospital's gross income.[6] Further, the hospital pays B&O tax on any amounts

---

[6] The Department argues that this situation is just like *Pilcher*, where we rejected a taxpayer's Rule 111 exemption claim because the taxpayer failed to show he had no more than agent liability. *Pilcher*, 112 Wn. App. at 437. *Pilcher* is inapplicable for two reasons. First, *Pilcher* involved Rule 111 rather than whether amounts met the statutory definition of "gross income." Second, the amounts at

it retains from payments for emergency room physician services. Thus, it is of no significance that the hospital did not pay NEP the exact amounts it receives in each tax year.

¶39 This case is similar to *Washington Imaging*, where we held that if money collected was not payment for services rendered by the taxpayer, and instead the money was forwarded to those who actually rendered the services, the amounts were not gross income to the collecting taxpayer. *Wash. Imaging*, 153 Wn. App. at 295. Washington Imaging Services (WIS) provided all the equipment and supplies necessary to produce medical images. *Wash. Imaging*, 153 Wn. App. at 284. WIS generated medical images and, because it did not have a medical license, contracted with Overlake, a group of radiologists, for professional interpretation of the images. *Wash. Imaging*, 153 Wn. App. at 284. WIS submitted a single global bill to patients that separately identified WIS's technical charges and Overlake's professional charges. *Wash. Imaging*, 153 Wn. App. at 284. WIS collected the payments from patients or their insurers and passed on to Overlake its professional fees minus an agreed on service charge. *Wash. Imaging*, 153 Wn. App. at 285. WIS had no ownership interest in the portion of the payments allocated to Overlake's professional fees; rather, WIS acted as the collection agent for Overlake. If the patient or the insurance company failed to pay the global bill, WIS had no obligation to pay Overlake. *Wash. Imaging*, 153 Wn. App. at 285.

¶40 On appeal, we reasoned that WIS lacked a medical license and therefore could not perform work Overlake performed. *Wash. Imaging*, 153 Wn. App. at 290. Also, WIS submitted a single bill that identified separate services performed, and once it received payment, "then forward[ed] the allocable portion of the payment to Overlake for the professional medical services that Overlake's radiologist

---

issue in *Pilcher* would have constituted gross income because the taxpayer in *Pilcher* performed the same services that his independent contractors performed. *Pilcher*, 112 Wn. App. at 431. The Department's argument fails.

rendered." *Wash. Imaging*, 153 Wn. App. at 290. Accordingly, this court held, "As in *Medical Consultants*, the money WIS collect[ed] for the professional medical interpretation of its medical images does not constitute payment for WIS' 'rendition of services,' but is 'passed through' to the actual renderers of the professional medical interpretation services, i.e., the Overlake radiologists." *Wash. Imaging*, 153 Wn. App. at 290-91 (quoting *Med. Consultants*, 89 Wn. App. at 48).[7]

¶41 Similarly here, the hospital lacks a medical license and cannot perform the physician services performed by NEP. The hospital also submits a single bill that identifies separate services performed and then forwards the allocable portion to NEP for NEP's professional services.[8] Accordingly, the money the hospital collects and pays to NEP does not constitute payment for the hospital's rendition of services but is paid to the actual renderers of the professional service. *Wash. Imaging*, 153 Wn. App. at 290-91.

¶42 The Department argues that, unlike WIS, the hospital is liable to NEP even if the patients or insurance companies refuse to pay the hospital. The Department has

---

[7] *Washington Imaging Services* pointed out that it need not address whether these payments constitute pass-through payments under Rule 111. *Wash. Imaging*, 153 Wn. App. at 294 n.4.

[8] The Department argues that the hospital did not submit a global bill separately identifying NEP's professional charges and the hospital's facility charges. This is incorrect. The Department cites to BTAR at 332-33, in which a hospital employee explained the billing process. She stated that, during the oral financial counseling, patients are not told about the hospital's roll as NEP's billing agent. But she explained that the bill "would say something like pro fee adjustment or pro fee something which would identify, to us anyway, that this was related to a professional fee—or professional charge versus a FAC, F-A-C, facility charge. And those were on statements that went out to patients." BTAR at 333. If patients called and asked about the separate billing charges, the hospital explained the billing.

The Department also cites to BTAR at 423, answer to production request no. 12. But that request asked for any documents given to emergency room patients that explained the relationship between the hospital and the physicians providing care, the patients receiving care and the hospital, and the patients receiving care and the physicians providing care. The hospital answered that no such documents existed. This in no way addresses the global billing issue about separate professional and facility charges.

attempted to distinguish *Washington Imaging* from *Medical Consultants* by arguing that unlike WIS, only MCN's clients were liable for payment to the physicians, but we held that there was no material distinction between MCN's and WIS' billing procedures. *Wash. Imaging*, 153 Wn. App. at 291. Thus, whether the taxpayer was liable for the payments was not a factor in *Washington Imaging*'s holding but a distinction raised by the Department.

¶43 Contrary to the Department's argument, RCW 82-.04.080 does not require that there be no more than agent liability before money received is not included in taxable gross income. The requirement of no more than agent liability under Rule 111 comes from the specific text of WAC 458-20-111. RCW 82.04.080 has no similar requirement. If we were to adopt the Department's argument, we would read into RCW 82.04.080 language that does not exist, which we do not do. *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 219, 173 P.3d 885 (2007) (statutory construction cannot be used to read additional words into a statute).

■■ ¶44 In a footnote, the Department argues that the hospital is not entitled to exclude the amounts it paid to NEP because WAC 458-20-168(2)(g)[9] explicitly prohibits such conduct. We may decline to address the merits of this issue because placing an argument of this nature in a footnote is, "at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal." *State v. Johnson*, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993).

---

[9] WAC 458-20-168(2)(g) states:

When a hospital contracts with an independent contractor (service provider) to provide medical services such as managing and staffing the hospital's emergency department, the hospital may not deduct the amount paid to the service provider from its gross income. If, however, the patients are alone liable for paying the service provider, and the hospital has no personal liability, either primarily or secondarily, for paying the service provider, other than as agent for the patients, then the hospital may deduct from its gross income amounts paid to the service provider.

Also, WAC 458-20-168(2)(g) was not in effect until 2008, eight years after the last taxable year at issue here. WAC 458-20-168(2)(g) does not change our analysis.

¶45 Finally, the Department argues that the money collected for emergency room physician services is part of the hospital's taxable gross income because recent Board decisions support the Department's argument. While we accord substantial weight to the Board's legal interpretations, we may substitute our judgment for the Board's. *Haley*, 117 Wn.2d at 728. We are not bound by prior Board decisions.

III. Attorney Fees

¶46 St. Joseph seeks costs pursuant to RAP 14.2 and attorney fees pursuant to RAP 18.1. As the Department argues, the hospital is not entitled to attorney fees because the hospital did not support its request with authority and argument as required by RAP 18.1.

¶47 In its reply brief, the hospital argues that it is entitled to fees under RCW 4.84.030 as the prevailing party. The hospital also argues that it is entitled to fees on appeal because we may award fees on equitable grounds as we see fit. A court may refuse to consider an argument raised for the first time in a reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). St. Joseph has not timely raised these arguments and we do not consider them.

¶48 We affirm in part and reverse in part. We hold that under the plain language of former RCW 82.04.4297, Medicare beneficiaries and Medigap insurers are not instrumentalities of the United States because they do not accomplish a government function or act on the government's behalf when they pay Medicare beneficiaries' copayments and

474

deductibles. As such, the hospital was not entitled to deduct amounts received for those payments from its gross income subject to the B&O tax. We also hold that, although St. Joseph is not entitled to a Rule 111 exemption for the amounts it pays NEP, the amounts do not constitute gross income under RCW 82.04.080 and, therefore, are not subject to the B&O tax. We affirm the Board's order as to Medicare payments, but reverse, vacate, and remand as to amounts paid to emergency room physicians.

HUNT and VAN DEREN, JJ., concur.

After modification, further reconsideration denied January 6, 2011.